**Martin Coker LASSITER, Petitioner,**

v.

**Elmer BLISS et ux., Respondents.**

**No. B–6622.**

Supreme Court of Texas.

Nov. 30, 1977.

Rehearing Denied Jan. 4, 1978.

John R. Lee, Kermit, for petitioner.

Trenchard, Davis & Hardwick, Robert Trenchard, Jr., Odessa, for respondents.

McGEE, Justice.

This is a suit for a permanent injunction, brought by Martin Coker Lassiter, to enjoin Elmer Bliss from maintaining a mobile home on a lot in the Memorial Park Addition of Kermit, Texas due to the restrictive covenants of the addition. The trial court, without a jury, granted the permanent injunction. The court of civil appeals reversed and rendered the judgment of the

trial court and denied Lassiter any relief being sought. 545 S.W.2d 571. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court.

Bliss purchased lot 13, block 7, in the Memorial Park Addition on May 24, 1975 from Jimmy K. Stroud. Stroud told Bliss at the time of sale that the restrictive covenants of the Addition prohibited trailers and "that the mobile home could not be put on that property." Bliss lived across the street from the mobile home's location and intended to either rent it or let his mother-in-law live in it. Stroud showed Bliss a copy of the restrictions at the time of sale, which provides in pertinent part:

> No trailer, basement, tent, garage or temporary quarters shall at any time be used as a residence on any portion of said Memorial Park Addition.

Lassiter resides on the lot adjacent to where Bliss seeks to put the mobile home. Lassiter's attorney told Bliss about the restrictive covenants and Lassiter's intention to enforce the covenants on the day Bliss put the mobile home on the lot. Bliss testified that when he talked to Lassiter's attorney the wheels were off of the mobile home and he was in the process of blocking it up. The record discloses that the mobile home is 12 feet wide, 65 feet long, and is connected to water, but has not been connected to a sewerage system; it is unclear whether or not the electricity has been hooked up. The record also discloses that a mobile home park is located within viewing distance of the lot in question but outside of Memorial Park Addition.

We hold that the restrictive covenant in this case prohibited Bliss from putting the mobile home on the lot. In Bullock v. Kattner, 502 S.W.2d 828 (Tex.Civ.App.—Austin 1973, writ ref'd n. r. e.), a party moved a mobile home into a subdivision and thereafter removed the wheels, connected water pipes, electric lines, and put blocks under it as a foundation. The restrictive covenant sought to be enforced provided:

> No trailer, basement, tent, shack, garage, barn or other outbuildings erected in this subdivision shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

The court in Bullock held that the restriction proscribed trailers used as residences temporarily or permanently and held as a matter of law that a mobile home with the wheels removed, placed on blocks and hooked to lights and water is still a trailer.

In Phillips v. Zmotony, 525 S.W.2d 736 (Tex.Civ.App.—Houston [14th Dist.]), rev'd per curiam, 529 S.W.2d 760 (Tex.1975), the court of civil appeals construed the following restrictive covenant to preclude mobile homes or trailer houses. The restrictive covenant stated in pertinent part:

> 3. Except as herein provided, no part of said tract shall be used for anything other than residential purposes . . .
>
> .   .   .   .   .
>
> 6. No trailer, . . . placed on any part of said tract, shall at anytime be used as a residence, nor shall any residence of a temporary character be permitted.

Zmotony, the party seeking to maintain the mobile home, received notice of the restrictions at the time the mobile home was being pulled by a truck to the lot. Subsequent to the notice the mobile home was moved onto the lot. The mobile home, which was 14 feet wide and 80 feet long, was connected to a private water supply, the wheels and the trailer tongue were removed, a metal skirt was installed around the bottom of the mobile home, the mobile home was put on concrete blocks and anchored to the ground with "tie downs." Zmotony had contracted for electric power and installation of a septic tank. Phillips sought a temporary injunction prohibiting the mobile home, which was denied by the trial court. The court of civil appeals reversed and remanded the cause, stating:

> [T]he intent of the restrictions are clear. The 67.61 acres of land is to be used only for residential purposes. No trailer is to be used as a residence. The mobile home is a trailer and is excluded by the restrictions.

525 S.W.2d 736, 739. This court, pursuant to Texas Rules of Civil Procedure 483, granted the writ and without hearing oral argument reversed the court of civil appeals because the evidence raised the question of whether the covenant had been waived. 529 S.W.2d 760, 762. The present case is distinguishable because here the trial judge granted the injunction and waiver of the covenant is not asserted.

We hold that the intention of the restrictive covenant in the present case was to prohibit trailers from being used as residences "at any time," whether as a temporary or permanent residence. Under the *Bullock* and *Zmotony* cases, we hold that the mobile home in this case was a "trailer" and was prohibited by the restrictive covenant. The term "trailer" is to be understood in its usual meaning regardless of whether it is referred to or described as a house trailer or mobile home. *See Jones v. Beiber,* 251 Iowa 969, 103 N.W.2d 364 (1960); *Mouille v. Henry,* 321 So.2d 377 (La.App.1975); *Timmerman v. Gabriel,* 155 Mont. 294, 470 P.2d 528 (1970); *Van Poole v. Messer,* 19 N.C.App. 70, 198 S.W.2d 106 (1973); cf. *Village of Harriman v. Kabinoff,* 243 N.Y.S.2d 210 (Sup.Ct.1963); *Astoria v. Notwang,* 221 Or. 452, 351 P.2d 688 (1960).

Bliss relies on *Crawford v. Boyd,* 453 S.W.2d 232 (Tex.Civ.App.—Fort Worth 1960, writ ref'd n. r. e.), and contends that his mobile home should be allowed to remain on the lot. Crawford sued Boyd to enforce restrictive covenants of a subdivision in Denton County, Texas. The restrictive covenants there provided:

2. No shacks or tents shall be permitted on this property . . . . Trailer homes are permitted on lots approved for trailers, being 33 through 54, both inclusive, and trailers may not be older than 1955 models.

. . . . .

6. All lots shall be residence lots and shall not be used for business, except lots No. 1, 55, 56, 57, 58, 59, 60, 61, 95, 96, 124 and 123, which each may be used for a bona-fide business. All other lots shall be residence lots only and no trailer homes shall be permitted thereon, except as provided in restriction two hereinabove, except that lots 33 through 54, inclusive, may be permitted for trailers, not older than 1955 models as set out in restriction No. Two hereinabove. . . .

Boyd owned several lots in the subdivision including lots 56, 57, 58, 59, 89 and 90. Boyd and his family lived in a house on lots 89 and 90 which burned in August 1967. Boyd then contracted with a mobile home manufacturer to build a building 12 feet wide and 65 feet long. Boyd built a concrete foundation for the building consisting of four slabs of reinforced concrete about 12 feet long. Boyd also built and installed a large septic tank to be used in connection with the building. It is important to note that the building was built to Boyd's specifications and was fabricated without axles or wheels. The structure was delivered by placing wheels and axles under the building and pulling it with a special truck that had a fifth wheel. The wheels and axles were taken out from under the building, and it was placed on the concrete foundation. The company then took the wheels and axles back with them. Subsequent to delivery, Boyd built a 12 foot by 16 foot room onto the building and poured a 12 foot by 20 foot foundation in front of the structure which Boyd hoped to use as a rumpus room. The buildings were tied down with cables and could not be moved without damaging them materially. The trial court rendered judgment for Boyd and filed no findings of fact and conclusions of law. The court of civil appeals affirmed the trial court, stating:

It is settled in Texas that in a nonjury trial where findings of fact and conclusions of law are not requested and none are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Seaman v. Seaman,* 425 S.W.2d 339 (Tex.Sup., 1968). . . .

In such a case the trial court's judgment implies that all necessary fact findings were made by that court in support of

the judgment. In determining whether there is any evidence to support the judgment and the implied findings of fact incident thereto the appellate court can consider only that evidence that is most favorable to the issue and must disregard entirely that which is opposed to it. *Renfro Drug Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609 (1950).

453 S.W.2d at 233. The court of civil appeals also noted that the physical design of the structure did not include axles or wheels. The court stated:

> The structure complained of was built by a mobile home company and from its description it looked a lot like a mobile home in that it was 12 feet wide and 64 feet long, with a wooden frame and with the exterior siding of aluminum. But it did not have axles or wheels. The owner never intended to use it as a trailer or as a vehicle. He bought it for the purpose of putting it on his lots, affixing it to his realty, and he says his intentions are to use it from now on as a home for himself and family at the location where it has been placed. It is tied to the ground with cables and connected to the septic tank and has become a part of the real estate.

The physical structure of the building involved in the *Crawford* case is substantially different from the structure of the trailer house in our case. The additions Boyd made to the building also serve to distinguish the *Crawford* case from the present case. In addition, the court of civil appeals was required to indulge in every presumption that the facts supported the findings of the trial court. We do not think that the *Crawford* case is authority for the proposition that a mobile home is not a trailer.

Bliss also relies on the case of *Hussey v. Ray*, 462 S.W.2d 45 (Tex.Civ.App.—Tyler 1970, no writ). Hussey sought to enforce a restrictive covenant and enjoin Ray from maintaining a mobile home on a lot in the subdivision where Hussey lived. The restrictive covenant provided:

> No trailer, tent, shack, stable or barn shall be placed, erected or be permitted to remain on any lot, nor shall any structure of a *temporary* character be used at any time as a residence. [Emphasis added].

Ray put the trailer on the lot, removed the wheels and placed it upon a concrete block foundation. Ray obtained connections to city water lines, electric power lines, telephone lines and installed a permanent type sewerage system. The trial court entered a summary judgment in favor of Ray, thus denying Hussey any injunctive relief. The court of civil appeals affirmed the trial court and held "that the primary purpose of the restriction, insofar as it relates to human habitation, was to prevent the property owner from using any temporary structure for a residence. . . . The use of a 'trailer' as a place of residence would likewise be prohibited if the same was temporary in nature." The language in the restriction of the *Hussey* case differs substantially from the language in the present case. The restriction before us at this time precludes trailers from being used as a residence "at any time" while the court of civil appeals construed the restriction in *Hussey* to preclude only those trailers used as a temporary residence. We do not believe that the *Hussey* case is dispositive of our question and specifically disapprove the case if it conflicts in any way with our holding that Bliss' trailer house or mobile home is a trailer.

The restrictive covenant in the present case had the specific intent of prohibiting trailers from being used at any time as residences in the Memorial Park Addition. We hold that Bliss' mobile home was a trailer within the meaning of the restrictive covenant and Bliss is precluded from maintaining it in the Memorial Park Addition.

Bliss asserts by cross-point that the trial court erred in failing to file findings of fact and conclusions of law pursuant to Texas Rules of Civil Procedure 296 and 297.[1] The record reveals the judgment was announced in open court on February 16, 1976. Bliss filed his motion for new trial on February 25, 1976. On April 8, 1976, the trial court

---

1. All references to Rules will be Texas Rules of Civil Procedure.

signed and entered the judgment in this cause. Under Rule 306a the date of rendition of the judgment in determining the time to file a motion for new trial ran from the date the judgment was signed. The motion for new trial was filed prior to the signing of the judgment. Under Rule 306c the motion was not invalid but was deemed to have been filed on the date of the rendition of judgment, April 8, 1976. Pursuant to Rule 329b(3) the motion for new trial was overruled by operation of law 45 days later, on May 24, 1976. On May 24, 1976, Bliss filed his first request for findings of fact and conclusions of law, which was within the ten-day filing period of Rule 296. The trial judge failed to file findings of fact and conclusions of law within the time period provided by Rule 297. Bliss timely filed his complaint of the failure of the trial judge to file findings of fact and conclusions of law on June 25, 1976. No findings of fact or conclusions of law have been filed in the record of this case.

Bliss' assertion of error because of the failure to file findings of fact and conclusions of law cannot be sustained because there is nothing in the record to indicate that the requests for findings of fact were ever presented to the judge. The request for findings of fact and conclusions of law, as well as the subsequent complaint for failure to file under Rule 297, must be presented to the judge. Merely filing the request and complaint with the clerk is insufficient. *Deweese v. Crawford,* 520 S.W.2d 522, 527 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.); *LaPlace v. LaPlace,* 390 S.W.2d 381, 382 (Tex.Civ. App.—Texarkana 1965, no writ); *Spradlin v. Rosebud Feed & Grain Co.,* 294 S.W.2d 301, 302 (Tex.Civ.App.—Waco 1956, writ ref'd n.r.e.); *Birdwell v. Pacific Finance Corp.,* 259 S.W.2d 957, 958 (Tex.Civ.App.— Dallas 1953, no writ); 4 McDonald, Texas Civil Practice, § 16.06, at 15–16 (rev.ed. 1971). There being nothing in the record to show that the request or complaint was ever presented to the trial judge, there is no reversible error in failing to file the findings of fact and conclusions of law.

The judgment of the trial court must be affirmed if questions of fact exist as to the applicability of the covenant to Bliss' mobile home. Since Bliss did not properly present his requests for findings of fact to the trial judge, all questions of fact are presumed found in support of the judgment. *Buchanan v. Byrd,* 519 S.W.2d 841, 842 (Tex.1975); *Morris v. Texas Elks Crippled Children's Hosp., Inc.,* 525 S.W.2d 874, 881 (Tex.Civ.App.—El Paso 1975, writ ref'd n.r.e.); *Harcrow v. Reed,* 425 S.W.2d 59, 61 (Tex.Civ.App.—Waco 1968, writ ref'd n.r. e.). Where findings of fact and conclusions of law are not properly requested and none are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Seaman v. Seaman,* 425 S.W.2d 339, 341 (Tex.1968); *City of Dallas v. Furrh,* 541 S.W.2d 271, 273 (Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.); *Durr v. Newman,* 537 S.W.2d 323, 325 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.). We have held that the restrictive covenant in this case precluded mobile homes from being used as residences in Memorial Park Addition, but even if a mobile home could become so affixed to the realty as to lose its status as a trailer, it must be presumed that the trial judge found that the mobile home in this case was still a trailer at the time of the suit.

Bliss asserts that the trial court erred in proceeding to judgment on the basis of the hearing of February 16, 1976, because proper notice was not given that the hearing was to decide the merits of the case. The record indicates that on January 5, 1976, all parties were present in open court for a hearing on a temporary injunction. Bliss sought a continuance which was granted subject to there being no more work done on the property. The court stated: "The court will set the day certain, not later than the month of February, in which a full blown hearing shall be had, and I can't do that until after the docket call of January 12th." Court was recessed for a few minutes while the calendar was checked. Then the following was stated in open court: "The defendants are restrained from any further activity on the property in question

until we have a full hearing on February the 16th, 1976, at 10:00 A.M. This court is in recess." The judge recorded on his docket: "Case called. Continuance granted subject to the Def's [sic] being restrained from any further action on property. Case set for 2/16/76 at 10 A.M." On February 16, 1976, Bliss announced ready for a hearing on a temporary injunction. The court stated that it had been announced in open court and agreed to by the parties on January 5, 1976, that the next hearing was to be a full hearing. The court stated that the hearing of February 16, 1976, was to be a full hearing on the merits. Bliss argues that under Rule 680 there was no notice or inadequate notice that the hearing was to be on the merits of the case.

■ The parties agreed at the January 5, 1976, hearing that Bliss was to be temporarily restrained until the full hearing on February 16, 1976. The judge announced in open court that a full hearing was to be held on February 16, 1976, and noted on his docket "case set." We hold that this was adequate notification that the subsequent hearing was to be a full hearing on the merits of the case. Bliss has failed to allege harm due to the notice given by the trial court and the record reveals that Bliss was represented by counsel and called witnesses on his behalf. The record does not reveal that Bliss was prejudiced in any way.

The judgment of the court of civil appeals is reversed and the judgment of the trial court is affirmed. Bliss is therefore enjoined from maintaining his mobile home in the Memorial Park Addition.

Dissenting Opinion by SAM D. JOHNSON, J., in which STEAKLEY and POPE, JJ., join.

SAM D. JOHNSON, Justice, dissenting.

This dissent is respectfully submitted.

The restrictive covenant being construed provides:

"No trailer, basement, tent, garage or temporary quarters shall at any time be used as a residence on any portion of said Memorial Park Addition."

In the instant case there is no contention that there has been a violation of the restriction against temporary quarters, nor are there allegations involving tents, basements or garages. The only contention presented is that the "mobile home" is a "trailer" within the purview of the restrictive covenant.

The majority opinion holds that a mobile home is a trailer. The majority bases its reasoning on those cases which deal with whether a mobile home is a permanent or a temporary structure that complies with restrictive covenants. By such an analysis, the majority has failed to apply the basic principles governing construction of restrictive covenants. Construction of a restrictive covenant, as with any other contract, is governed by the intent of the parties at the time the covenant is made and will not be extended by implication. *Couch v. Southern Methodist University*, 10 S.W.2d 973 (Tex.Com.App.1928, holding approved); *Settegast v. Foley Bros. Dry Goods Co.*, 114 Tex. 452, 270 S.W. 1014 (1925, opinion adopted). This court has made it quite clear that where the language of a restrictive covenant is ambiguous the covenant shall be strictly construed, favoring the free use of property and the best interest of the public. *Baker v. Henderson*, 137 Tex. 266, 153 S.W.2d 465 (1941). Under application of these principles, the issue here presented is not whether the mobile home is a temporary or a permanent structure, but whether the mobile home in its present state of development, sophistication, and utilization was within the intention of the parties to the restrictive covenant, which did no more than prohibit trailers.

Elmer Bliss and his wife have allegedly violated a restrictive covenant created by a dedication of the Memorial Park Addition to the City of Kermit, Texas, executed October 18, 1948. In 1948 the term "mobile home," as well as the structure with its residential amenities, did not exist.[1] The

1. Historical and statistical data on the trailer and the mobile home were compiled herein from: B. Hodes and G. Roberson, *The Law of Mobile Homes* (3rd ed. 1974); F. Bair, "Mobile

mobile home is a structure physically, functionally, and socially distinct from the trailer of the 1940's as well as from the trailer of the 1970's.

## TRAILERS

The prototype of the trailer had its advent in the mid-1920's. The 1920 trailer was a small, recreational vehicle which was easily transportable and simple in design; this vehicle was no wider than eight feet and varied in length from ten to twelve feet. By the 1940's the trailer was more widely used; these trailers remained relatively compact, retaining the eight-foot width and slightly extending its overall length. The trailers of this era provided makeshift accommodations primarily designed for ease of movement and travel. These trailers were in no way designed to be permanently located at one campsite; therefore, they were not provided with utility connections or plumbing facilities. A negative stigma became associated with trailers during this period due to the transient, gypsy image that was the stereotype of the poorly maintained communal campsites. These gathering areas created special health and sanitation problems which predictably resulted from the densely populated campsites with inadequate water supply and waste disposal. For the most part, trailer users tended to be migrant and transitory workers from lower socio-economic groups. Communities regarded such transients as undesirables who were not interested in the well-being of the community; therefore, many municipalities adopted a "thirty-day rule" restricting the period in which a trailer could park within the community to no longer than thirty days. Consequently, as a result of social pressure, as well as structure and design, the trailer of the 1940's strictly provided highly mobile and temporary accommodations. In the

1940 census the United States Bureau of Census grouped trailers along with railroad cars, tents, and shacks rather than with single-unit family housing.[2]

The modern trailer has developed substantially in design and social acceptance. Trailers now encompass a large category of vehicles, including hauling trailers, camping trailers, tent-trailers, and other recreational vehicles. However, each of these vehicles retains the characteristics of the 1940 trailer. Mobility remains the central feature that controls the trailer's design and utilization. The trailers of the 1970's continue to be designed in size and weight so that they can be easily drawn by an average or ordinary automobile without requiring special trucks or highway permits. These trailers are not designed for affixation to the ground or permanent connection to utilities or sewerage. They are widely utilized for recreation, travel, and camping. This court noted the seasonal use of trailers in *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162, 167 (1959), wherein the court allowed the issuance of revenue bonds to fund the addition of trailer park facilities to an existing recreational park. The court noted that the trailer park would not create a residential area within the park but would constitute " . . . a place where parking space, sanitary facilities and electricity are supplied to those who make use of house trailers *while traveling about the country for recreational or business purposes.*" [Emphasis added.] Therefore, in terms of function, mobility, size, and costs the trailer has attained a particular and distinct status.

## MOBILE HOMES

Since its advent in 1954 and 1955, the mobile home has evolved in a manner significantly different from trailers. The term "mobile home" was first utilized by

Homes—A New Challenge," 32 Law & Contemp. Prob. 286 (1967); 2 R. Anderson, American Law of Zoning §§ 11.49–11.58 (1968); Shephard's Mobile Homes and Mobile Home Parks (1975); and 2 N. Williams, American Planning Law Land Use and the Police Power §§ 57.01–57.42 (1974).

2. Shephard's Mobile Homes and Mobile Home Parks at 3 (1975), citing *Mobile Homes in Idaho—A Status Report*, Boise State College, Center for Business and Economic Research (1973).

Elmer Frey in labeling the ten-foot wide structure which provided the additional area necessary to accommodate residential facilities and amenities. By the 1960's and the 1970's, mobile homes were available in twelve-foot widths, fourteen-foot widths, and expandable units. The lengths of these homes averaged sixty to sixty-four feet with some units exceeding eighty feet. In area the mobile home equals small single-unit dwellings with 700 to 1,400 square feet.

From the outset these mobile homes were designed for permanent, residential use. The interiors are divided into various rooms, including living rooms, family rooms, dining rooms, kitchens, multiple bedrooms, and one or more bathrooms. Ample storage space is provided by utility rooms, closets, cupboards, and pantries. The mobile home is equipped with electrical wiring, plumbing, ventilators, gas or electric cooking systems, refrigerators, hot water heaters, and totally equipped kitchens. Just as with other forms of comfortable housing, various options are available, which include garbage disposals, dishwashers, washers and dryers, central heating and air conditioning, sunken baths and saunas. In addition, the mobile home is fully furnished with carpeting, draperies, and free-standing furniture. These residential amenities are available at prices comparable to the cost of moderate income homes, with costs ranging from $5,000 to prices which exceed those of other forms of permanent housing. In the 1970 census the United States Bureau of Census recognized mobile homes as a significant element in the housing supply, comprising over thirty percent of the available single-family housing.[3]

The major distinction between the mobile home and other forms of permanent housing is that the mobile home is at least initially equipped with an undercarriage and wheels. These allow the mobile homes to be moved from the dealer to the lot where they will be permanently located. Once transported to the homesite, the mobile home is designed to be permanently affixed to the ground and connected, as a traditional home, to all utilities with the appropriate meters. Movement of the mobile home may not be accomplished with an ordinary automobile. Movement of the mobile home requires special transport permits, a powerful hauling truck, and is relatively expensive. Therefore, the mobile home is mobile only in a very limited sense. Statistics compiled by the Housing Division of the Texas Department of Community Affairs reflect that the majority of mobile homes are moved only once, that being from the dealer to its present, permanent location.[4]

The mobile home and the trailer are distinct and quite different structures. In terms of size, cost, and utilization, the mobile home constitutes a vital form of permanent housing. The trailer, on the other hand, constitutes a popular travel or recreational vehicle. Both the United States Congress and the Texas Legislature have recognized the distinct status of the mobile home. In the National Mobile Homes Construction and Safety Standards Act of 1974, 42 U.S.C. § 5401, *et seq.*, Congress determined that ". . . it is necessary to establish Federal construction and safety standards for mobile homes and to authorize mobile home safety research and development." 42 U.S.C. § 5401. In so doing, Congress defined "mobile home" as:

". . . a structure, transportable in one or more sections, which is eight body feet or more in width and is thirty-two body feet or more in length, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained therein; . . ." 42 U.S.C. § 5402(6).

Similarly, in the Mobile Homes Standards Act, Texas Revised Civil Statutes Annotated, Article 5221f, the Texas Legislature stated:

---

3. Practising Law Institute, *Mobile Homes—Legal and Business Problems* at 14 (2d ed. 1971).

4. Texas Department of Community Affairs, Division of Housing, *Texas Mobile Home Survey*, at 19 (Sept. 1974).

"It is the legislature's intent to improve the general welfare and safety of the citizens of this state. *The legislature finds that mobile homes have become a primary housing resource of many of the citizens of the state*; that a growing awareness exists that many consumers are injured by unprincipled and dishonest members of the mobile home industry, that current warranties are deficient, that existing means of remedying these injustices are inadequate and do not provide a viable means for protecting the consumer, and that it is the responsibility of the state to provide for the protection of its citizens through the imposition of certain regulations on the mobile home industry. In recognition of these findings, the legislature deems it necessary to expand various regulatory powers to deal with these problems. The legislature finds this to be the most economical and efficient means of dealing with this problem and serving the public interest. Accordingly, this Act shall be liberally construed and applied to promote its underlying policies and purposes." [Emphasis added.]

In establishing these standards the Texas Legislature utilized the identical definition of "mobile home" as enunciated in the National Mobile Homes Construction and Safety Standards Act, *supra*. With the legislative bodies affording unique status to mobile homes, the courts should and must recognize the distinct nature of mobile homes and not allow covenants designed to control a use of one kind to apply to a use of quite a different character.

Therefore, as the restrictive covenant in the instant case was imposed in 1948, before the advent of the mobile home, such homes could not have been and were not within the contemplation of the parties to the restrictive covenant. Furthermore, as the average housing in Memorial Park is valued at $8,000 or $8,500, there can be no contention that the mobile home does not compare in size, cost, and quality to the average homes in the surrounding subdivision. This court may not enlarge by implication the intentions of the parties; the restrictive covenant should be limited precisely to prohibit what is encompassed by its language, to wit, trailers.

Even should the proper inquiry be whether the mobile home is a temporary or a permanent structure, as the majority opinion implies, the mobile home should not be restricted by the covenant. The court of civil appeals in considering the instant case held that *Hussey v. Ray*, 462 S.W.2d 45, at 45 (Tex.Civ.App.—Tyler 1970, no writ), was persuasive, as the court construed a covenant with similar wording and intent. The majority of this court disagrees with the court of civil appeals and holds that the covenant construed in *Hussey* is distinguishable. The restriction in *Hussey* stated:

"No trailer, tent, shack, stable or barn shall be placed, erected or be permitted to remain on any lot, nor shall any structure of a temporary character be used at any time as a residence."

This writer does not recognize this language as significantly distinguishable from the restriction in the instant case, which reads:

"No trailer, basement, tent, garage or temporary quarters shall at any time be used as a residence on any portion of said Memorial Park Addition."

The court in *Hussey* gave consideration to the fact that the term "trailer" was contained within the same clause as the statement concerning temporary structures. The court noted that this syntax was indicative of the intent of the maker of the restriction and held that the primary purpose of the restriction was to prevent the owner of the property from using any temporary structure for a residence. The covenant in the instant case also utilizes the term "trailer" and "temporary quarters" in the same clause, reflecting the intent of the maker to prohibit the use of the land from temporary habitation or makeshift dwellings. The mobile home cannot be said to be a makeshift or a temporary structure; it is a permanent structure with great utility and service to a substantial segment of

society. As noted previously, its mobility is marginal; the vast majority of mobile homes are moved from the dealer's lot to a particular purchased site where they remain permanently affixed to the ground and connected to all utilities.

The mobile home constitutes a significant form of permanent housing as noted by the Texas Legislature in its declaration of purpose in the Mobile Homes Standards Act, *supra*. The majority of mobile home dwellers see the mobile home as their permanent residence. The mobile home has become a major form of housing in Texas with one out of every three homes purchased in 1972 being a mobile home. In cost and size, it is comparable to a moderate income home.[5] The public has accepted the mobile home as a permanent form of residence; accordingly, the courts must recognize the stature of the mobile home in the housing industry and its fulfillment of the public need for economical housing as did the court in *Yeager v. Cassidy*, 20 Ohio Misc. 251, 253 N.E.2d 320, 323–24 (1969), in which the court held:

> "The court is of the opinion that the issue evoked by these proceedings is of broad import and will probably become critical as the use of pre-fabricated and pre-built structures becomes more prevalent.
>
> " . . . .
>
> "It should be pointed out that in most situations, the restrictive covenants were imposed before the advent of the modern mobile home, and therefore, were not within the contemplation of the imposer of the restrictions. The courts must acknowledge that pre-built homes, mobile or otherwise, which in a given case may be more attractive in appearance and design than many conventional homes built completely on the site, are a part of our changing society, and give recognition to the fact that the law must be responsive to the best interests of those whom it is designed to serve. Unless such dwellings are expressly and explicitly excluded by the terms of a protective covenant, their

use should not be enjoined, provided that in each case, the dwelling otherwise conforms to the spirit of the restriction."

The mobile home does not warrant categorization as a trailer or as a temporary or a makeshift structure; therefore, it cannot be said to be prohibited by the restrictive covenant.

This writer would hold that the restrictive covenant should be enforced to prohibit the utilization of trailers as residences on the lots in the Memorial Park subdivision; however, the restriction should not be enlarged to prohibit the occupation of mobile homes as residences in the subdivision. It is apparent that it could not have been and was not the intention of the parties to the 1948 restrictive covenant to prohibit mobile homes. Furthermore, under a strict reading of the covenant, the language does not encompass the permanent residential dwellings offered by mobile homes. Therefore, as neither the intention of the parties nor a strict reading of the covenant supports a finding that mobile homes are encompassed by the restriction, this writer would affirm the opinion of the court of civil appeals.

STEAKLEY and POPE, JJ., join in this dissent.

---

5. Statistics and conclusions are the result of a statewide survey of mobile home occupants. Texas Department of Community Affairs, Division of Housing, *Texas Mobile Home Survey* (Sept. 1974).