NUMBER 13-01-156-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI




IN THE INTEREST OF S.Q., C.Q., 

F.Q., M.Q., AND A.Q., CHILDREN





On appeal from the County Court at Law No. 5

of Nueces County, Texas.






O P I N I O N


Before Justices Dorsey, Yañez, and Rodriguez

Opinion by Justice Dorsey


 Laura Quitugua appeals from a judgment which terminated her parental rights to her five minor children. The issues raised
on appeal are whether the evidence is sufficient to support termination of her parental rights, and whether the trial court
erred in denying her motion for new trial. We affirm.

I. Background

Laura Quitugua is the biological mother of five minor children. Their biological father (1) lives in Guam and has not seen
the children for seven years. The Texas Department of Protective and Regulatory Services ("TDPRS") took custody of the
children because they were living on the streets, and two of the older boys had allegedly sexually abused their two sisters. 
On May 13, 1999, the TDPRS filed suit to terminate Quitugua's parental rights to her children, S.Q., C.Q., F.Q., M.Q., and
A.Q. TDPRS was named as the children's temporary managing conservator.

On July 21, 1999, the court held a status hearing at which time TDPRS announced a family-service plan. TDPRS wanted
Quitugua and her boyfriend, Gill Jackson, (2) to (1) locate and maintain appropriate housing suitable for the family, (2)
maintain employment, (3) obtain psychological and psychiatric evaluation, (4) obtain drug and alcohol assessment, (5)
attend and complete parenting classes, and (6) cooperate with TDPRS. According to TDPRS neither Quitugua nor Jackson
completed the family-service plan.

On October 31, 2000, the parties tried the termination suit to the bench. Two TDPRS case workers, Lois Castillo and
Debra Arismendez, testified about the abuse and neglect the children had suffered. Castillo started a case on Quitugua and
her children in April, 1998. At that time the children lived on the streets without supervision. Two of the girls complained
that their brothers had sexually abused them, one child complained that Quitugua's boyfriend, Gill Jackson, had beaten him
with a belt, and another child was hospitalized because of a suicide threat. Castillo said that TDPRS removed the children
from Quitugua's custody because of the sexual abuse and because Quitugua was not protecting the children from further
sexual abuse.

Arismendez testified that Quitugua worked part time, sporadically took part in individual therapy, completed eleven
parenting classes over a one and one-half year period, gave urine samples, which were negative, and had a psychological
evaluation. However she stressed that Quitugua did not consistently comply with the family-service plan; i.e., she (1) had
not completed her parenting classes, (2) had made only one child-support payment, (3) failed to obtain appropriate housing
for her children, and (4) had not made effectual progress regarding the sexual abuse of her children, their protection, and
the environment to which the children were subjected. Arismendez had given Quitugua a list of public housing and referred
her to County Welfare and Catholic Social Services. County Welfare approved her for public housing, but she never
obtained appropriate housing for her children.

Arismendez testified that Jackson was a major part of all the issues regarding Quitugua's children and the home. Jackson
agreed to take part in the services which TDPRS offered, but he did not finish. He drank and abused Quitugua and the
children. Because of the abuse Arismendez asked Quitugua to leave him in order to help the children, Quitugua refused to
leave him. 

Racheka Garza, Director of Social Services at the Salvation Army shelter, testified that on Jackson's advice, Quitugua
would refuse food and shelter for her children. The first time Jackson, Quitugua, and the children came to the shelter,
Garza told Jackson that he could not stay there. Because he could not stay he would not let Quitugua and the children stay
there. The children became upset because they wanted food and a place to sleep. Quitugua and her children returned to
live in the shelter a couple of weeks later. After moving into the shelter the children made great progress with report cards. 
Garza described the children as having behavioral problems. She said that Quitugua attended several parenting classes but
never finished them. Garza saw Jackson hit one of the children on the back and said that the children told her that Jackson
hit them and their mother. Garza said that the children loved their mother and had a close relationship with her.

Dr. Diana Bill was a therapist for two of Quitugua's children, A.Q. and M.Q. A.Q. had oppositional defiant disorder and
attention deficit disorder as well as problems with bed-wetting. Dr. Bill testified that these problems stemmed from "his
background of either not being supervised by his mother, being homeless, watching his mother's boyfriend be violent either
toward his brother or his mother, and the constant moving around." M.Q. had the same disorders as A.Q. Her foster
parents planned to take her to Disney World; however, when she learned that her siblings could not go too, she became
severely depressed and required hospitalization. The children were not ready to stop therapy and needed a permanent
home. Dr. Bill stated that the children loved their mother, were loyal to her, and that they spoke positively of her boyfriend. 
When asked if she thought that the children should remain in the custody of TDPRS, she said, "it's definitely a viable
option. My concerns about that is that these children need some permanency. . . ."

Rosaicela Villarreal, a counselor, met with Quitugua and all her five children once, and with Quitugua and four of the
children approximately eight to ten times. One of the children told her he wanted to stay with his mother and siblings but
would run away if Jackson was still there. The other children are willing to live with their mother if changes are made. 
She said that the smaller child wanted to return to Quitugua but had no comfort level with the older siblings. When asked
if the children should be returned to their mother, Villarreal stated that it would be a big gamble. She was worried about
housing and about Quitugua staying with a man who beat her, is an alcoholic, and did not help her therapeutically. 
Quitugua had the potential to become more protective of her children, but emotionally, she was not ready to protect them. 
Villarreal stated, "From a therapeutic prospective, yes, progress has been made, but not at a level where it would probably
be considered appropriate . . . for the safety of the kids. . . ."

Quitugua's Testimony


Quitugua believed her main obstacle was housing, and she did not want her parental rights terminated. She and Jackson
pay $35 per night for a hotel room. She testified that she could not keep a job because of her diabetic problems. She had
done everything Debra Arismendez had asked of her and said that Arismendez told her that she had finished her parenting
classes and not to worry about paying child support. She and Jackson participated in the substance intervention counseling,
and she attended individual counseling. She believed that TDPRS did not like Jackson because he was black and stated she
would only leave him under court order. She said that the children never saw Jackson hit her; rather, they only saw the
results of the beatings. When asked why she did not find a place to live after the government had granted her money, she
stated that she could only find two-bedroom homes, which were too small. According to her a three-bedroom home was
too expensive. She admitted that she had not raised the children by herself for the past five years.

After hearing the evidence the trial court found the evidence clear and convincing that Quitugua had knowingly placed or
allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being and
that it was in the best interest of the children that the court terminate Quitugua's parental rights to all the children. The trial
court signed the termination order on November 1, 2000.

Quitugua did not request findings of facts or conclusions of law. When findings of facts and conclusions of law are not
requested, and none are filed we must affirm the judgment if we can uphold it on any legal theory that finds support in the
evidence. In the Interest of W.E.R., 669 S.W.2d 716, 717 (Tex. 1984) (per curiam) (citingLassiter v. Bliss, 559 S.W.2d 353,
358 (Tex. 1977)). This is so regardless of whether the trial court articulates the correct legal reason for the judgment. 
J.M.R. v. A.M., 683 S.W.2d 552, 555 (Tex. App.-Fort Worth 1985, writ ref'd n.r.e.). 

II. Analysis


1. Sufficiency Of The Evidence.

By issue one Quitugua asserts that the evidence is insufficient to support termination. Section 161.001 of the Texas Family
Code governs the involuntary termination of the parent-child relationship. Under that section a court may order termination
of the parent-child relationship if it finds by clear and convincing evidence one or more of the statutory grounds set out in
section 161.001(1) and determines that termination is in the best interest of the child as required by section 161.001(2).
Tex. Fam. Code Ann. § 161.001 (Vernon 1996 & Supp. 2001). Relevant to this case section 161.001(1) provides that the
court may order termination of the parent-child relationship if the court finds by clear and convincing evidence the parent
has "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the
physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon 1996 & Supp. 2001). 
"Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction about the truth of the allegations sought to be established. Tex. Fam. Code Ann. § 101.007
(Vernon 1996 & Supp. 2001). In a clear and convincing evidence case an appellate court may sustain an insufficient
evidence point when: (1) the evidence is factually insufficient to support a finding by clear and convincing evidence; or (2)
a finding is so contrary to the weight of contradicting evidence that no trier of fact could reasonably find the evidence to be
clear and convincing. In the Interest of W.C., No. 14-00-01280- CV, 2001 WL 1013581, at *21-22 (Tex. App.-Houston
[14th Dist.] 2001, no pet. h.). See Leal v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 320 (Tex.
App.-Austin 2000, no pet.); In the Interest of L.R.M., 763 S.W.2d 64, 67 (Tex. App.-Fort Worth 1989, no writ). Because
the involuntary termination of parental rights interferes with fundamental constitutional rights, see Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985); In re G.M., 596 S.W.2d 846, 846 (Tex. 1980), we must strictly scrutinize involuntary
termination proceedings in favor of preserving the relationship. See Holick, 685 S.W.2d at 20.

The record reflects that Quitugua, although approved for public housing, failed to obtain public housing or any suitable
housing for her children. Instead, she and Jackson paid $35 per night for hotel rooms which were not big enough to house
the five children. Her failure to obtain suitable housing denied the children a stable environment where they could sleep,
do their school work, and function as a normal family. Quitugua failed to properly supervise and take care of her children. 
This allowed for the older children to sexually abuse their two younger sisters. Quitugua knew of this problem, but failed
to address it. The children had behavioral problems; two of them had sexually abused their younger sisters, two of them
suffered from oppositional defiant disorder and attention deficit disorder, and another child suffered from depression. 
Quitugua had diabetes and was not able to keep a steady job. Further, she remained in the company of her boyfriend, Gill
Jackson, thus exposing the children to a man who drank and had abused Quitugua and one of the children. Jackson was
subject to the family-service plan, but did not complete it.

Therefore we find there was sufficient evidence to enable the trial court as the fact-finder to determine by clear and
convincing evidence that Quitugua knowingly placed or knowingly allowed her children to remain in conditions or
surroundings which endangered their physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon
1996 & Supp. 2001).

Best Interest Of The Children


In deciding whether the evidence is sufficient to support the court's ruling that termination would be in the children's best
interest we apply the non-exclusive factors found in Holley v. Adams, 544 S.W.2d 367 (Tex. 1976). Some of those factors,
pertinent to the evidence presented in this case are: (1) the emotional and physical needs of the children now and in the
future; (2) the emotional and physical danger to the children now and in the future; (3) the parental abilities of the
individuals seeking custody; (4) the programs available to assist these individuals to promote the best interest of the
children; (5) the stability of the home or proposed placement; (6) the acts or omissions of the parent which may indicate
that the existing parent-child relationship is not a proper one; and (7) any excuse for the acts or omissions of the parent. Id.
at 371-72. 

Here the evidence showed that: (1) Quitugua failed to provide suitable housing for her children; (2) failed to supervise her
children; (3) that the older siblings had sexually abused their younger sisters; (4) that the children had behavioral problems;
(5) that due to Quitugua's failure to leave her boyfriend the children were exposed to a violent relationship; (6) Quitugua's
boyfriend abused one of the children, and (7) TDPRS offered services to Quitugua, but she failed to complete the family
service plan. There was nothing to show that Quitugua's behavior or her conditions were likely to improve to the point
where she could adequately care for five children with behavioral problems. Applying the Holley factors to these facts
there was sufficient evidence under the clear and convincing standard for the trial court to conclude that termination was in
the children's best interest. Accordingly we overrule issue one.

2. Motion For New Trial.

By her second issue Quitugua complains that the trial court erred in denying her motion for new trial. A trial court's
decision to deny a motion for new trial is reviewed for abuse of discretion. See Director, State Employees Workers'
Compensation Div. v. Evans, 889 S.W.2d 266, 270-71 (Tex. 1994). An abuse of discretion occurs when a trial court acts
without reference to any guiding rules or principles; in other words, when the trial court's act was arbitrary or unreasonable. 
Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990).

Quitugua filed a motion for new trial, alleging that (1) trial counsel failed to call a witness who was present at the time of
trial, and (2) failed to issue subpoenas for other witnesses. She did not attach any affidavits to the motion. She was the
only witness to testify at the new-trial hearing and stated that one month before trial she gave trial counsel the names and
addresses of three persons whom she wanted subpoenaed. These persons were a librarian, a manager of a local soup
kitchen, and Gill Jackson, her boyfriend. According to Quitugua these witnesses would have testified about the
circumstances surrounding her children. However she did not testify about what these witnesses would have specifically
testified to, which would have had some effect on the trial court's decision to terminate her parental rights. She merely
stated that these witnesses knew about the situation with her children. These witnesses did not testify at the new-trial
hearing. Jackson was present for the trial, but had to be removed because he appeared intoxicated. There is no new
evidence that became available after the trial. We hold that the trial court did not abuse its discretion by denying the
motion for new trial. We overrule issue two. 


 We AFFIRM the trial court's judgment.





______________________________

J. BONNER DORSEY,

Justice



Do not publish .

Tex. R. App. P. 47.3(b).



Opinion delivered and filed

this 6th day of December, 2001.

1. The trial court has previously terminated the father's parental rights to all five children.

2. TDPRS offered services to Jackson because he and Quitugua were a couple and had been together for several years.