3–D ELECTRIC COMPANY, INC., Appellant,

v.

BARNETT CONSTRUCTION COMPANY and Barnett Construction Company d/b/a Metropolitan Contractors, Inc., Appellees.

No. 05–84–01107–CV.

Court of Appeals of Texas, Dallas.

Jan. 30, 1986.

Rehearing Denied Feb. 26, 1986.

William L. Kirkman, Fort Worth, for appellant.

Harold B. Gold, Dallas, for appellees.

Before CARVER,[1] VANCE and MALONEY, JJ.

---

**1.** Justice Carver not participating in this decision.

MALONEY, Justice.

3–D Electric Company, Inc. ("3–D") appeals the trial court's order which sustained Barnett Construction Company's special appearance and dismissed the suit. 3–D contends that the trial court erred in granting the motion challenging jurisdiction, in failing to file findings of fact and conclusions of law, and in applying new law retrospectively. For the following reasons, we affirm the judgment of the trial court.

In 1979, J.C. Harville, the president of Metropolitan Contractors, Inc. ("Metropolitan"), a Tennessee corporation engaged in business as a general contractor, telephoned Richard Kinney, the president of 3–D, a Texas corporation engaged in the electrical contracting business, regarding electrical work to be performed on a Holiday Inn Motel to be built in Trinidad, Colorado (the "Trinidad project"). Barnett Construction Company ("Barnett"), a Tennessee corporation engaged in business as a general contractor, acted as the general contractor on the Trinidad project. Barnett sent the initial plans to 3–D in Duncanville, Texas. In the summer of 1979, Kinney went to Trinidad and met with T.C. ("Cooper") Barnett (the president of Barnett), Dave Fisher (the owner of the Trinidad project), T.O. ("Tom") Barnett (the chief executive officer and sole shareholder of Barnett), and Harville. At this meeting, the arrangements were discussed concerning the construction of the motel. The actual construction began shortly thereafter. The parties agree that Barnett and 3–D entered into an oral contract. The motel was completed, and 3–D billed Barnett for the electrical work performed. Barnett did not pay the full amount of the bills, and 3–D sued Barnett in Texas for breach of contract.

Barnett specially appeared, claiming that the trial court did not have personal jurisdiction. The trial court disagreed and proceeded with a jury trial on the merits. The court granted an instructed verdict in favor of Barnett. Subsequently, the court granted 3–D's motion for new trial, a second jury trial was held, and a verdict was returned in 3–D's favor. However, on Barnett's motion, the trial court reconsidered its ruling on personal jurisdiction in light of the intervening decision in *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), and concluded that it had no personal jurisdiction over Barnett and Barnett d/b/a Metropolitan.

In its first point of error, 3–D contends that the trial court erred in granting the motion challenging the personal jurisdiction over Barnett and Barnett d/b/a Metropolitan. Our disposition of this contention requires a two-fold inquiry: first, whether Barnett and Metropolitan are related corporate concerns, and thus Metropolitan's many contacts with Texas should be used to establish jurisdiction over Barnett; second, if we conclude that we are foreclosed from an examination of Metropolitan's contacts with Texas, we must then decide whether Barnett's own contacts with Texas are sufficient for a Texas court to assert jurisdiction over it.

### Corporate Identities of Barnett and Metropolitan

For purposes of this discussion, we shall assume, without deciding, that Metropolitan's contacts with Texas are sufficient for a Texas court to assert jurisdiction over it. 3–D recites the following facts which it claims establish that Barnett and Metropolitan act as one:

(1) Tom Barnett has always been the chief executive officer and sole shareholder of Barnett, and was the sole shareholder of Metropolitan;

(2) Tom Barnett's daughter-in-law purchased Tom Barnett's stock in Barnett with a note to him in 1981, and had only paid the interest on the note at the time of trial;

(3) Cooper Barnett is Tom Barnett's son, and was the president of Barnett at the time the contract was performed and was the president of Metropolitan at the time of trial;

(4) Tom Barnett was the president of Barnett at the time of trial;

(5) Harville was the president of Metropolitan and initially contacted 3–D regarding the Trinidad project and supervised the Trinidad project before Cooper Barnett took over the control of the project;

(6) Barnett and Metropolitan were located in the same building;

(7) At the same time as the Trinidad project, Barnett was also acting as contractor on a project in Riverton, Wyoming, with 3–D as electrical contractor (the "Riverton project"), and Metropolitan was acting as contractor on a project in Richardson, Texas with 3–D as electrical contractor (the "Richardson project");

(8) Tom Barnett told Richard Kinney at the Richardson project not to worry about getting paid for the electrical work at the Trinidad project;

(9) Harville was authorized to sign the contract between Barnett and 3–D on the Riverton project, and also signed for Metropolitan on the contract between Metropolitan and 3–D on the Richardson project; and,

(10) According to Richard Kinney, his impression was that Tom Barnett was the "last say" on both the Trinidad project and the Riverton project, Barnett and Metropolitan were not separate corporations, Harville identified himself with Barnett, and Metropolitan was only incorporated to employ non-union labor that Barnett could not employ.

Although 3–D did not allege that Barnett and Metropolitan had a parent-subsidiary corporate relationship,[2] we will look to the principles applicable to that relationship for guidance in the instant case. *Cf. Mortgage and Trust, Inc., v. Bonner & Co., Inc.,* 572 S.W.2d 344, 348–51 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.) (referring to cases involving parent and subsidiary corporations in the course of analyzing whether the corporations alleged to be "alter egos" of one another did in fact have an "alter ego" relationship, even though the particular corporations were not parent and subsidiary).

■■■■ Courts will not disregard the separate legal entities of corporations merely because one owns stock in the other or because of interlocking directorships "unless such relationship is being used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime." *Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336, 339 (Tex.1968) (citations omitted) (*quoting State v. Swift & Co.,* 187 S.W.2d 127, 131–32 (Tex.Civ.App.—Austin 1945, writ ref'd)). In *Bell* the Texas Supreme Court reiterated the principle set out in *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 351 (1955), and reaffirmed in *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 202 (Tex.1962):

> Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.

Absent a showing of fraud or injustice, the supreme court would not allow the plaintiff to look to the defendant for payment of debts incurred by the defendant's affiliate and subsidiary. *See Bell Oil & Gas Co.,* 431 S.W.2d at 339–41; *cf. Edwards Co. v. Monogram Industries, Inc.,* 730 F.2d 977, 983–84 (5th Cir.1984), and *Gentry v. Credit Plan Corporation of Houston,* 528 S.W.2d 571, 573 (Tex.1975), with *Hanson South-*

---

**2.** We note that 3–D did not plead that Barnett and Metropolitan were subsidiary and parent or that they were the "alter egos" of one another. *See Pederson v. Dillon,* 623 S.W.2d 696, 697 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). Nevertheless, we shall consider the "alter ego" issue; it was raised by the evidence at the hearing on the motion to the jurisdiction and at trial. *See* TEX.R.CIV.P. 67; *Petty v. Ferguson,* 601 S.W.2d 782, 785 (Tex.Civ.App.—Fort Worth 1980, writ dism'd); *LaMarque Independent School District v. Thompson,* 580 S.W.2d 670, 673 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ).

west Corp. v. Dal-Mac Construction Co., 554 S.W.2d 712, 717–18 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.).[3]

■ To determine whether the subsidiary is a mere adjunct of the parent we look to the following factors: whether the two file consolidated income tax returns, whether operating capital is financed by the parent, the extent to which separate books and accounts are kept, whether they have common departments or businesses, whether they have separate meetings of shareholders and directors, whether an officer or director of one corporation is permitted to determine policies of the other, and whether there are any other facts which also indicate that the subsidiary is a mere conduit. *Moffett v. Goodyear Tire & Rubber Co.*, 652 S.W.2d 609, 613 (Tex.App.—Austin 1983, writ ref'd n.r.e.); *see also Gentry*, 528 S.W.2d at 573–75.

■ Generally, a foreign parent corporation is not subject to the jurisdiction of the forum state merely because its subsidiary conducts business in that forum. The presence of one in a forum may not be attributed to the other. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159–60 (5th Cir.1983). However, in some circumstances, a close relationship between parent and subsidiary may justify a finding that the parent "engages in business" in the jurisdiction through the local activities of its subsidiary. *Hargrave*, 710 F.2d at 1159; *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir.1974). The ownership of 100 percent of the stock and the commonality of officers and directors are not alone sufficient to establish an "alter ego" relationship between two corporations. To acquire jurisdiction over the parent, the parent must exercise a greater degree of control over the subsidiary's internal business operations and affairs than is normally associated with common ownership and directorship. *Hargrave*, 710 F.2d

at 1160; *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *see also Turner v. Jack Tar Grand Bahama, Ltd.*, 353 F.2d 954, 956 (5th Cir.1965) (although not directly indicating whether the case involved parent and subsidiary corporations, stating the same rule).

The record in the instant case reflects that the two corporations filed separate income tax returns, and kept separate books and records, and further, that there was no subcontract work between them. Moreover, Barnett was not a subsidiary of Metropolitan. 3–D acknowledges that Barnett and Metropolitan are separate on paper but argues that, in their actual construction management, they were the same and had substantial ties to Texas. 3–D does not allege fraud but appears to argue that it would be unjust to hold that these two corporations are two separate entities.

At this point, we note that 3–D presented no evidence to show that Barnett ever did business as Metropolitan. Barnett's secretary-treasurer testified that Barnett had no control over Metropolitan, and that Barnett and Metropolitan were viable and separate corporations. The only significant factors which exist to suggest corporate unity are that some of the officers held office in both corporations, that the two corporations were located in the same building, that Tom Barnett owned the stock in both corporations, that Metropolitan's former president was authorized to sign the contract between Barnett and 3–D on the Riverton project and had some authority over the work at the Trinidad project, and that Richard Kinney never thought that the corporations were separate.

■ Commonality of officers in Barnett and Metropolitan is not alone sufficient to establish an "alter ego" relationship between the two corporations. *Hargrave*,

---

**3.** We note that the foregoing rule applies in contract cases. In tort cases, it is not necessary for the plaintiff to establish fraud or injustice, and the financial strength or weakness of the subsidiary is an important consideration. *Gentry*, 528 S.W.2d at 573. In these cases, the plaintiff does not have the burden of justifying its recovery since it did not willingly contract with the subsidiary. *See Gentry*, 528 S.W.2d at 573; *Hanson Southwest Corp.*, 554 S.W.2d at 717.

710 F.2d at 1160; *Walker,* 583 F.2d at 167. Evidence that Barnett and Metropolitan officed in the same building does not invoke the "alter ego" theory. *Mortgage and Trust, Inc.,* 572 S.W.2d at 350. A showing that Barnett and Metropolitan were related in some ways was not enough. *See Product Promotions, Inc.,* 495 F.2d at 493. It was the burden of 3–D "to sort out these business relationships," *Product Promotions, Inc.,* 495 F.2d at 493, and that burden was not met. *See Hargrave,* 710 F.2d at 1160–61; *Murdock v. Volvo of America Corporation,* 403 F.Supp. 55, 57 (N.D.Tex.1975). Our review of the record reflects that "[t]he corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925). We find that 3–D has not presented evidence which would establish the exercise of the degree of control necessary for Metropolitan's activities in Texas to be attributed to Barnett. *See Hargrave,* 710 F.2d at 1160; *Murdock,* 403 F.Supp. at 57.

Finally, the mere fact that Tom Barnett owned stock in both Barnett and Metropolitan is not enough to hold that the two corporations act as one. There is no limit on the number of corporations that one may own or control. *Associates Development Corp. v. Air Control Products, Inc.,* 392 S.W.2d 542, 544 (Tex.Civ.App.— Austin 1965, writ ref'd n.r.e.). Although Tom Barnett owned the stock in both corporations, that does not mean that the lia-bilities of Barnett should be imposed on Metropolitan without some showing by 3–D of a connection between Metropolitan and 3–D. *See Rosenthal v. Leaseway of Texas, Inc.,* 544 S.W.2d 180, 183 (Tex.Civ.App.— Tyler 1976, no writ).[4] The initial contacts of 3–D with Harville, the president of Metropolitan, are not sufficient to establish that connection.

Each case involving disregard of the corporate entity must rest upon its own special facts, and our review of the facts of this case leads us to the conclusion that we should not consider the contacts of Metropolitan in Texas in our determination of whether the trial court could obtain jurisdiction over Barnett. *See Rosenthal,* 544 S.W.2d at 182.

### Contacts of Barnett with Texas

Barnett does not contend that it has not "done business" in Texas within the meaning of the Texas 'long-arm' statute.[5] In pertinent part, the statute provides:

Act of engaging in business in state as equivalent to appointment of Secretary of State as agent

Sec. 3. Any foreign corporation, association, joint stock company, partnership, or non-resident natural person that engages in business in this State, irrespective of any Statute or law respecting designation or maintenance of resident agents, and does not maintain a place of regular business in this State or a designated agent upon whom service may be made upon causes of action arising out

---

**4.** *Compare Tigrett v. Pointer,* 580 S.W.2d 375, 400 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.) (on motion for rehearing) (holding that, if the relationship between several corporations all owned by the same person is such that they constitute *a single business enterprise,* a creditor may attack the separate identity of each without showing that the creditor dealt with all of them, and that, if no such relationship is shown, the court is not justified in imposing liability on the corporations with which the creditor has not dealt). In the *instant case,* we have found that Barnett and Metropolitan do not constitute a single business enterprise. Thus, some dealings between 3–D and Metropolitan would be necessary to hold Metropolitan liable even on the facts that Tom Barnett owned both Barnett and Metropolitan.

We note, in passing, that the holding of this court in *Tigrett,* 580 S.W.2d at 400, regarding the ability to hold related corporations liable if they constitute a single business enterprise, was questioned in *Edwards Co. v. Monogram Industries Inc.,* 730 F.2d 977, 983 n. 12 (5th Cir.1984). In *Edwards,* the Fifth Circuit stated that liability should not be imposed on related corporations constituting a single business enterprise unless there is some showing of fraud or injustice against the plaintiff.

**5.** TEX.REV.CIV.STAT.ANN. art. 2031b (Vernon 1964 and Vernon Supp. 1985).

of such business done in this State, the act or acts of engaging in such business within this State shall be deemed equivalent to an appointment by such foreign corporation, joint stock company, association, partnership, or non-resident natural person of the Secretary of State of Texas as agent upon whom service of process may be made in any action, suit or proceedings arising out of such business done in this State, wherein such corporation, joint stock company, association, partnership, or non-resident natural person is a party or is to be made a party.

Doing business in state; definition

Sec. 4. For the purpose of this Act, and without including other acts that may constitute doing business, any foreign corporation, joint stock company, association, partnership, or non-resident natural person shall be deemed doing business in this State *by entering into contract by mail or otherwise with a resident of Texas to be performed in whole or in part by either party in this State,* or the committing of any tort in whole or in part in this State. The act of recruiting Texas residents, directly or through an intermediary located in Texas, for employment inside or outside of Texas shall be deemed doing business in this State (emphasis added).

Therefore, Barnett is amenable to process under 2031b, and the only question is whether the due process requirements of the fourteenth amendment would be satisfied if Barnett was sued in Texas. *See U-Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760, 764 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978).

In order to obtain jurisdiction over Barnett, the federal due process guarantee requires that Barnett have had such minimum contacts with Texas that the maintenance of the suit would not "offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Fifth Circuit has articulated the due process test as requiring that the "defendant must have some minimum contacts with the state resulting from an affirmative act or acts on its part, and it must not be unfair or unreasonable to require the nonresident defendant to defend the suit in the forum." *Southwest Offset, Inc. v. Hudco Publishing Co.,* 622 F.2d 149, 152 (5th Cir.1980)(citing *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 494 (5th Cir.1974)).[6]

In *Helicopteros,* the Supreme Court stated that the "minimum contacts" test depends first on whether the cause of action relates to or arises out of Barnett's contacts with Texas. If it does not, then Barnett must have continuous and systematic business activity here. If it does, then the relationship among Barnett, the forum, and the litigation is the proper focus. *See Helicopteros,* 104 S.Ct. at 1872–73; *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). It seems clear that, in this case, the cause of action relates to Barnett's oral contract with 3–D which was initiated by the phone call to Kinney in Texas.

---

**6.** In *Burstein v. State Bar of California,* 693 F.2d 511, 518 n. 12 (5th Cir.1982), the Fifth Circuit questioned the validity of the two-pronged test enunciated by the court in *Product Promotions, Inc.,* in light of the Supreme Court's statement in *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), that the single test is that "the maintenance of the suit not offend 'traditional notions of fair play and substantial justice,'" *Insurance Corp. of Ireland, Ltd.,* 456 U.S. at 702–03, 102 S.Ct. at 2104 (*quoting International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)), and that the requirement of minimum contacts is a result of that test. *Insurance Corp. of Ireland, Ltd.,* 456 U.S. at 702 n. 10, 102 S.Ct. at 2104 n. 10. *See infra* pp. 145–46. However, after *Burstein* was decided, the Fifth Circuit reiterated the two-pronged test in *Hydrokinetics, Inc., v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1028 (5th Cir.1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984); *C & H Transportation Co. v. Jensen and Reynolds Construction Co.,* 719 F.2d 1267, 1269 (5th Cir.1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984); and *Growden v. Ed Bowlin and Associates, Inc.,* 733 F.2d 1149, 1150 (5th Cir.1984).

In *U-Anchor*, the Texas Supreme Court repeated the three basic elements that must exist to obtain jurisdiction over a nonresident:

(1) the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*U-Anchor*, 553 S.W.2d at 762 (*quoting O'Brien v. Lanpar Company*, 399 S.W.2d 340, 342 (Tex.1966)). Here, as in *U-Anchor*, the cause of action arises out of Barnett's contractual obligation to 3-D.[7] However, Barnett must also have purposefully engaged in some transaction in Texas, and the assumption of jurisdiction by the Texas court must not offend traditional notions of fair play and substantial justice. *U-Anchor*, 553 S.W.2d at 762. 3-D contends that, if article 2031b is satisfied, then the first two prongs enunciated in *U-Anchor* are automatically satisfied. However, this assertion is contrary to the supreme court's holding in *U-Anchor*, 553 S.W.2d at 763, in which it stated that, although the defendant did business in Texas within the meaning of the statute, he did not purposefully conduct any activities within the state.

Concerning the instant contract, Barnett's contacts consisted of telephone calls, correspondence, and payments to 3-D in Texas. Harville initially called Kinney in Texas and asked him if he was interested in doing the electrical work for the Trinidad project. Cooper Barnett also called Kinney. Barnett sent 3-D initial plans for the Trinidad project, and after the first meeting in Colorado, Barnett sent 3-D a letter stating its intent to award 3-D the electrical sub-contract for the Trinidad project. Cooper Barnett contacted Kinney regarding a price quotation several times. Kinney testified that, in a telephone conversation, Cooper Barnett and he agreed on how the job would be handled and that the contract would be a "cost plus" agreement. On the other hand, Cooper Barnett testified that Kinney gave him a firm quotation on the telephone.

3-D did some preliminary design work and gathering of information in Texas and sent materials from Texas. However, all construction work was performed in Trinidad. All meetings regarding the plans for and cost of the Trinidad project occurred in either Colorado or Tennessee.

■ Clearly, the making of payments in Texas is not sufficient to establish minimum contacts. *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1029 (5th Cir.1983), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2180, (1984). *U-Anchor*, 553 S.W.2d at 763. Moreover, the unilateral activity of 3-D in Texas cannot satisfy the

---

**7.** We note that in *C & H Transportation Co.*, 719 F.2d at 1269, the Fifth Circuit stated that the second prong announced in *U-Anchor* is not required for constitutional due process. However, the court in *C & H Transportation Co.*, 719 F.2d at 1269 n. 8, did note that the second prong, the nexus requirement, might be constitutionally required in light of language in *Hall v. Helicopteros Nacionales, S.A.*, 638 S.W.2d 870, 872 (Tex.1982), *rev'd*, 466 U.S. 408, 104 U.S. 1868, 80 L.Ed.2d 404 (1984), in which the Texas Supreme Court stated that the second prong is a necessary requirement when the nonresident defendant has only maintained single or few contacts with the forum. Of course, the Supreme Court reversed the decision in *Hall*, but it did not explicitly disagree with this portion of the Texas Supreme Court's decision. Instead, the court focused on the situation in which there is no nexus and thus "continuous and systematic" contacts are necessary in order to allow a court to obtain jurisdiction over a foreign defendant. *Helicopteros*, 104 S.Ct. at 1873 (*citing Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). At any rate, we need not concern ourselves with whether this second prong is required since it was clearly met in the instant case.

requirement of contact with the forum state. There must be some act of the defendant by which it purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *U–Anchor,* 553 S.W.2d at 763. Under this standard, we are unable to find that the trial court could assert jurisdiction over Barnett.

In *Hydrokinetics, Inc.,* 700 F.2d at 1029–30, in considering a suit on a contract and the totality of the facts, the court found that payments made in Texas, correspondence and telephone calls to Texas, a visit by the defendants to Texas, and acceptance of the contract in Texas were insufficient to establish minimum contacts, in light of a contractual provision that Alaska law was to govern and construe disputes. Likewise, those same facts, absent a visit of Barnett to Texas and absent any contractual provision for Tennessee law to govern and construe disputes, appear here.[8] Also, in *Barnstone v. Congregation Am Echad,* 574 F.2d 286, 288–89 (5th Cir.1978), the Fifth Circuit was faced with a situation quite similar to the one at hand. The plaintiff performed architectural services for the defendant and sued for payment. The contract was for architectural services for the construction of a synagogue in Maine. The plaintiff prepared drawings in Texas and negotiations took place either in Maine or through the mail. The court affirmed the dismissal of the case because no purposeful activity of the defendant occurred in Texas.

We mention that the holding in *Beechem v. Pippin,* 686 S.W.2d 356, 361–63 (Tex. App.—Austin 1985, no writ), that the contacts of the nonresident defendants with Texas were sufficient for a Texas court to assert jurisdiction over them, is inapplicable to the case at hand. In *Beechem,* the court considered a situation in which a Georgia defendant's representative initiated a lease contract by telephone calls to the plaintiff in Texas, the defendants mailed a payment to the plaintiff in Texas, and the defendants corresponded with the plaintiff in Texas. These facts are similar to the facts in the instant case. However, in *Beechem,* the court also noted that the contract was solicited and negotiated by phone calls to Texas, the defendants paid for the transfer of the machine leased from the plaintiff to and from its original Texas location, the defendants caused their insurance agent to contact the plaintiff in Texas to arrange for coverage for the machine, and that the defendant's representative owned real and personal property in Texas and had previously conducted sales in Texas. *Beechem,* 686 S.W.2d at 362. Thus, the court held that the contacts of the defendant's representative, both related and unrelated to the cause, were quantitatively and qualitatively sufficient to make him answerable to the Texas courts on the alleged breach of contract and that the contacts of the defendant corporation with Texas, through the acts of its representative, were sufficient to warrant the exercise of jurisdiction over it. *Beechem,* 686 S.W.2d at 363.

In *Beechem,* there were clearly more contacts with Texas than in the instant case and thus the "[n]arrow factual distinctions ... sufficed to swing the due process pendulum," *Beechem,* 686 S.W.2d at 362 (*quoting U-Anchor,* 553 S.W.2d at 764), in favor of the plaintiff. Moreover, in *Beechem,* 686 S.W.2d at 363, the court was careful to note that merely contracting with a Texas resident will not alone support jurisdiction in Texas courts to determine whether a breach has occurred. That is precisely what is before us: a contract made with a Texas resident; attempted price negotiations pertaining to the contract by way of telephone calls with the

---

**8.** The Fifth Circuit also noted the fact that the defendant's sole contact with Texas was the transaction involved in that case. *Hydrokinetics, Inc.,* 700 F.2d at 1029. In our case, the last time that Barnett did business in Texas was in 1967 or 1968 when it did construction on a restaurant at the Houston airport.

Texas resident; and the performance of the contract in Colorado.

3–D cites several cases which it argues indicate that the test for whether the court may obtain jurisdiction over the nonresident defendant has been relaxed. First, 3–D cites *Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). In that case, the Supreme Court did not overrule any prior test. It did state, however, that the personal jurisdiction requirements represent a restriction on judicial power, not as a matter of sovereignty, but as a matter of individual liberty. It then reiterated the test of whether the maintenance of the suit in the jurisdiction would offend traditional notions of fair play and substantial justice. *Id.*, 456 U.S. at 702–03, 102 S.Ct. at 2104. The Supreme Court stated that its holding did not alter the requirement that there be minimum contacts, but rather it dealt with how minimum contacts need be shown. *Id.*, 456 U.S. at 702 n. 10, 102 S.Ct. at 2104 n. 10.

3–D also cites *Burstein v. State Bar of California*, 693 F.2d 511, 517–18 (5th Cir. 1982), in which the court interpreted *Insurance Corporation of Ireland, Ltd.*, as stating that the standard is " 'traditional notions of fair play and substantial justice' with 'contacts' viewed as a way of demonstrating whether the standard is satisfied." Finally, in *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1271 (5th Cir.1983), a personal injury case, the test was whether the defendant had purposefully availed itself of the privilege of conducting activities in the forum state and whether traditional notions of fair play and substantial justice would be offended. In *DeMelo*, the foreign defendant had manufactured and sold paint in the forum state which caused an explosion and fire in the forum state, injuring the plaintiff. Of course, that case is very different from the one at hand. We hold that, even if the "minimum contacts" test has been relaxed, it has, nevertheless, not been met in this case. Clearly, there was no purposeful activity of Barnett in Texas. Barnett did not purposefully avail itself of

the privilege of conducting activities in Texas, and traditional notions of fair play and substantial justice would be offended by a Texas court asserting jurisdiction over it.

3–D also argues that we must consider the fact that Barnett never contended that Texas was an inconvenient forum and that Barnett cannot make that allegation because it frequently came to Texas in connection with its work for Metropolitan and has initiated other litigation in the U.S. District Court in Corpus Christi. We have already held that we will not consider Metropolitan's contacts with Texas to ascertain whether Barnett has had minimum contacts with Texas, and moreover, there is nothing in our record to indicate that Barnett *initiated* any litigation in the U.S. District Court in Corpus Christi. Even if Barnett has initiated that litigation, this fact would not change the other facts that there was no purposeful activity of Barnett in Texas regarding the contract with 3–D and that Barnett did not consent to jurisdiction in this case. This claim is groundless.

■ Further, 3–D contends that, although it is not a controlling factor, we must consider that Barnett never argued that any state's law other than Texas applied to the transaction, and that this case was tried under Texas law. We point out that Barnett made a special appearance to object to jurisdiction over it at the very beginning of the proceedings, which objection was denied. Even if Texas law can properly be applied to the dispute, that does not mean that a Texas court necessarily has jurisdiction over the parties to the dispute. *Shaffer v. Heitner*, 433 U.S. 186, 215, 97 S.Ct. 2569, 2585, 53 L.Ed.2d 683 (1977); *see also TM Productions, Inc. v. Blue Mountain Broadcasting Co.*, 623 S.W.2d 427, 433 (Tex.Civ.App.—Dallas 1981), *writ ref'd n.r.e. per curiam*, 639 S.W.2d 450 (Tex.1982). The court does not acquire jurisdiction "by being the 'center of gravity' of the controversy, or the most convenient location for litigation. The issue is personal jurisdiction, not choice of

law. It is resolved in this case by considering the acts of [Barnett]." *See Hanson v. Denckla,* 357 U.S. 235, 254, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). We have already held that the acts of Barnett in Texas were not sufficient to confer upon the Texas court the power to assert personal jurisdiction over it.[9]

Finally, 3–D cites cases from other circuits in support of its position that minimum contacts exist in our case. Most of the cases are readily distinguishable on their facts including *Jacobs/Kahan & Co. v. Marsh,* 740 F.2d 587, 592–93 (7th Cir. 1984) (the defendants were physically present in the forum state to transact business; the contract was partially negotiated, executed, and substantially performed in the forum state; and the contract would likely be governed by the forum state's law); *Snyder v. Smith,* 736 F.2d 409, 416 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984) (the defendant came to the forum state to negotiate with the plaintiff over the purchase price and transacted business while in the forum state); and *Commercial Design, Inc. v. Dean/Dale and Dean Architects,* 584 F.Supp. 890, 893 (E.D.Mo.1984) (the contract was made in the forum state and all labor to be performed by the plaintiff was in the forum state).

3–D also cites *Madison Consulting Group v. South Carolina,* 752 F.2d 1193 (7th Cir.1985), which is probably most supportive of its position. In *Madison,* the court found that jurisdiction existed where the defendant solicited the plaintiff in the forum state to prepare a study and report, there was some performance by the plaintiff in the forum state, the forum state was convenient to the plaintiff, the defendant could travel, and the forum state had an interest in the contract. The court seemed

to interpret *Insurance Corp. of Ireland, Ltd.,* as abandoning the state sovereignty test of *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291–92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980), and focusing on "the protection against inconvenient litigation" test. *Madison,* 752 F.2d at 1199. The Seventh Circuit interpreted *Insurance Corp. of Ireland, Ltd.,* as establishing a general "reasonableness" test, *Madison,* 752 F.2d at 1199, and found that "the relationship among the defendant, the forum and the litigation" justified personal jurisdiction. *Madison,* 752 F.2d at 1205 (*quoting Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977)). Although the facts in *Madison* are somewhat analogous to our facts, we feel constrained by the aforementioned authorities from our jurisdiction to hold that it would violate the due process guarantee if Texas exercised jurisdiction over Barnett.

The trial court's decision to grant the motion to the jurisdiction appears to be based on the legal conclusion that the decision in *Helicopteros* changed the law, and thus governed the court. We do not interpret the decision in *Helicopteros* as changing the law, but only as holding that the facts established that the defendant's contacts with Texas were insufficient to satisfy due process. *Helicopteros,* 104 S.Ct. at 1874. However, even if the trial court's order is based on an incorrect conclusion of law, we should sustain it if correct on any other basis. *See Bantuelle v. Williams,* 667 S.W.2d 810, 814 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *Muller v. Nelson, Sherrod & Carter,* 563 S.W.2d 697, 701–02 (Tex.Civ.App.—Fort Worth 1978, no writ). We hold that the judgment was correct on the theory that Barnett did not have minimum contacts with Texas and that jurisdic-

---

9. Moreover, we note that, although a "choice of law" provision in a contract is significant in determining whether jurisdiction should be had in the forum state, *see Hydrokinetics, Inc.,* 700 F.2d at 1029, such a provision cannot be construed as a voluntary submission by a defendant to the personal jurisdiction of the courts of the state in the absence of any express understanding to that effect. *Sun-X International Co.*

*v. Witt,* 413 S.W.2d 761, 767 (Tex.Civ.App.—Texarkana 1967, writ ref'd n.r.e.). Likewise, the consent of Barnett to use Texas law in this case should not be construed as a voluntary submission by Barnett to the personal jurisdiction of the Texas courts in the absence of an express assertion to that effect. Obviously, Barnett has made no assertion of that kind. Barnett clearly objected to the jurisdiction of the trial court.

tion over it in Texas would offend traditional notions of fair play and substantial justice.

### Findings of Fact and Conclusions of Law

In its second point of error, 3–D contends that the trial court erred in not filing findings of fact and conclusions of law when it granted the motion objecting to the jurisdiction. We note that there is no signature by the trial judge where provided to show that he received the findings of fact and conclusions of law. Merely filing a request to file and a reminder to file findings of fact and conclusions of law is insufficient. *Lassiter v. Bliss*, 559 S.W.2d 353, 358 (Tex.1977). Absent a showing that findings of fact were properly presented to the trial judge, all questions of fact are presumed in support of the judgment. Where no findings of fact and conclusions of law are properly requested and filed, the judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. There is nothing in the record to indicate that the findings of fact and conclusions of law were presented to the trial judge, and thus, there is no reversible error. *Lassiter*, 559 S.W.2d at 358; *Owens v. Travelers Insurance Co.*, 607 S.W.2d 634, 637 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.). We have already held that the judgment is correct on the legal theory that Barnett did not have enough contacts with Texas for the court to have jurisdiction over it.

### Application of New Law

In its final point of error, 3–D contends that the trial court erred in applying new law retrospectively. 3–D argues that, to the extent that *Helicopteros* made new law, it was unforeseeable. Thus, although there is a general rule that supreme court decisions are retroactive in operation, the exception to the general rule should apply. *See Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex.1983). We have previously noted that *Helicopteros* did not make new law; therefore, there was nothing unforeseeable of which 3–D may complain. Indeed, in the briefing of its argument under its first point of error, 3–D concedes that *Helicopteros* did not make new law. We find no merit in 3–D's third point of error.

Accordingly, we affirm the judgment of the trial court and tax costs to 3–D.