Charles H. **SCHLOBOHM** and Joneen L. Schlobohm, Appellants,

v.

Rolf L. **SCHAPIRO**, Appellee.

No. 05–87–01265–CV.

Court of Appeals of Texas, Dallas.

Sept. 9, 1988.

Rehearing Denied Oct. 18, 1988.

---

James H. Baumgartner, Jr., David Reese, Dallas, for appellants.

Howard V. Tygrett, Dallas, for appellee.

Before STEPHENS, HECHT and KINKEADE, JJ.

STEPHENS, Justice.

Charles Scholobohm and Joneen Schlobohm (collectively referred to as Schlobohm) appeal from a trial court order dismissing their cause of action against Rolf Schapiro for lack of in personam jurisdiction. Schlobohm brought suit against Rolf Schapiro, Hangers Dry Cleaners & Laundry, Inc., and Douglas Schapiro for amounts due pursuant to a commercial lease. Rolf Schapiro made a special appearance pursuant to Texas Rules of Civil Procedure 120a, claiming that the trial court did not have in personam jurisdiction. The trial court agreed and severed him from the lawsuit. In four points of error, Schlobohm asserts that the court in fact has in personam jurisdiction over Rolf Schapiro and it erred in sustaining his objection to the jurisdiction of the court. Further, Schlobohm contends that the trial court exceeded its authority by ruling on the merits of the case. We disagree and, accordingly, affirm the judgment of the trial court.

Rolf Schapiro is a physician who lives and practices in Pennsylvania. Schapiro's son, Douglas, lives in Dallas. In July 1984, Douglas approached Schapiro with the idea of forming a corporation to establish dry cleaning stores in major office buildings. Hangers Dry Cleaners and Laundry, Inc. was incorporated on July 23, 1984. Schapiro "loaned" several thousand dollars to the business in exchange for stock in the company. The business initially did well and Douglas informed Schapiro of his desire to expand the business by leasing a building and installing a dry cleaning machine and a laundry machine. Sometime in November 1984, Schapiro made a downpayment on the equipment. On November 12, 1984, Schlobohm leased a building to Hangers for a term of sixty months. Hangers occupied the building until some time in August 1986. Schlobohm brought suit for non-payment of rentals for August 1986 and as it accrues until the end of the lease term in 1989.

In points of error one and two, Schlobohm asserts that the trial court erred in sustaining Schapiro's objection to the in personam jurisdiction of the court.

Schlobohm first argues that the trial court should have focused its legal analysis on the constitutional limitations of Due Process rather than limiting its inquiry to the Texas Long Arm Statute's "doing business" language. The Long Arm Statute is set out in section 17.042 of the Texas Civil Practice and Remedies Code and states in pertinent part: "In addition to other acts that may constitute doing business, a non-resident does business in this state if the nonresident: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state...."

Schapiro never had any personal contact with Schlobohm. The lease contract is signed only by Douglas as president of Hangers. Schapiro's contacts with Texas are set out below:

1. August 15, 1984, as the sole director of Hangers, Schapiro conducted the first meeting of the Director at the corporation's registered office in Dallas.

2. Schapiro remained the sole director until his resignation "at the end of the year 1985."

3. In November 1984, Schapiro "loaned" Hangers the money for the downpayment on the equipment to be installed in the leased premises.

4. In December 1984 or January 1985, Schapiro became the sole stockholder in Hangers.

5. In January 18, 1985, Schapiro came to Dallas and obtained a $136,702.10 loan in his individual capacity with MBank to purchase the equipment. The security agreement states that the collateral on the loan is all equipment leased by Schapiro to Hangers which is kept at the leased premises.

6. Schapiro continually deposited money in the Hangers account for payroll and expenses. These "loans" are allegedly evidenced by promissory notes which could not be located. These notes allegedly total $24,000.00 and $450,000.00.

7. In January 1986, Schapiro came to Dallas with his wife to visit his children

and "hoping we could get some information [about Hangers]."

8. On March 28, 1986, while in Pennsylvania, Schapiro entered into a security agreement with MBank to secure the debts of Hangers. Schapiro assigned $10,000.00 from his personal account with MBank to cover Hangers' insufficient funds checks.

The only other contact Schapiro had with Texas was when he took his medical specialty board examination in Dallas approximately twenty-five years ago and when he attended a workshop in San Antonio on behalf of his Pennsylvania hospital.

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a State to assert in personam jurisdiction over a non-resident defendant. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404 (1984). In determining the constitutional reach of the state's jurisdiction over persons with only a single or few contacts with Texas, a three-pronged test has been developed:

(1) the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;

(2) the cause of action must arise from, or be connected with, such act or transaction; and

(3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 663 (Tex.1987). As Schapiro is not a party to the contract upon which Schlobohm brings suit, the court must determine whether his contacts with Texas constitute the kind of continuous and systematic general business contacts which would justify the imposition of in personam jurisdiction. *See Zac Smith,* 734 S.W.2d at

633; *3–D Electric Co. v. Barnett Construction Co.,* 706 S.W.2d 135, 141 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

Due process requirements are satisfied when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'the traditional notions of fair play and substantial justice.'" *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872, *quoting International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Schlobohm argues that Schapiro's "purposeful commercial contacts with Texas" justify the exercise of personal jurisdiction; that the cause of action arose out of and is related to such "purposeful commercial contacts with Texas"; and that the exercise of in personam jurisdiction in this case would not offend traditional notions of fair play and substantial justice. We disagree.

The touchstone of the minimum contacts test is whether the nonresident defendant has "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of the forum's laws. *Texas Commerce Bank National Ass'n v. Interpol '80 Limited Partnership,* 703 S.W.2d 765, 772 (Tex.App.—Corpus Christi 1985, no writ). We hold that Schapiro's trips to Dallas relating to Hangers in August 1984 to conduct the Director's meeting and in January 1986 to visit his children and to find out the status of Hangers, cannot be described or regarded as contact of a "continuous and systematic" nature. *See Helicopteros,* 466 U.S. at 416–17, 104 S.Ct. at 1873. Further, although Schapiro came to Dallas and obtained a loan in January 1985, the loan agreement is not connected with Schlobohm's cause of action for amounts due upon Hangers' lease. Therefore, this single contact with Texas does not support the imposition of jurisdiction over Schapiro. *See Zac Smith & Co.,* 734 S.W.2d at 663. We overrule Schlobohm's points of error one and two.

In point of error three, Schlobohm argues that after a plaintiff has set forth any basis to sustain jurisdiction over a non-

resident defendant, the burden to show that he is not amenable to the court's jurisdiction is upon the defendant.

Schlobohm asserted in their petition that Schapiro's commercial transactions were sufficient to satisfy the minimum contacts requirements necessary to justify in personam jurisdiction. At the special appearance hearing, Schlobohm did not meet the burden of showing that Schapiro purposefully availed himself of the benefits and protection of Texas laws; therefore, the burden of proof did not shift to Schapiro under Rule 120a. *See Minexa Arizona, Inc. v. Staubach,* 667 S.W.2d 563, 564–65 (Tex.App.—Dallas 1984, no writ); *see also Zac Smith & Co.,* 734 S.W.2d at 664. We overrule Schlobohm's third point of error.

In point of error four, Schlobohm argues that the trial court exceeded its authority under Texas Rules of Civil Procedure 120a by ruling on the merits of the case and in holding that a finding of alter ego was a prerequisite to establishing Schapiro's amenability to suit within Texas. No request for findings of fact or conclusions of law was filed by either party.

■ The determinations Schlobohm complains of are contained within a letter written by the trial court to the parties stating its holding that Schapiro's objection to the jurisdiction should be sustained. The court states that no alter ego relationship exists between Schapiro and Hangers and then distinguishes the facts of record in the present case from those of *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex. 1986). Findings of Fact and Conclusions of Law need not be in any particular form other than they must be in writing. *Villa Nova Resort, Inc. v. State,* 711 S.W.2d 120, 124 (Tex.App.—Corpus Christi 1986, no writ). If the court makes Findings of Fact and Conclusions of Law, the fact that they are contained within a letter does not affect their validity, as long as they are filed with the clerk and become a part of the record. *Id.* The trial court's letter is attached to Schlobohm's Supplemental Motion for Reconsideration and is part of the record before this Court.

■ Texas Rules of Civil Procedure 120a(2) specifically states: "No determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof." Therefore, even though the trial court's letter may contain Findings of Fact and Conclusions of Law, Schlobohm is not harmed because they are not binding upon the merits of the suit.

■ Further, the trial court properly determined the alter ego issue. Schlobohm specifically alleged in their First Amended Original Petition that Schapiro and his son are liable for Hangers' debt because: (1) the corporate entity is a sham and is nothing more than the alter ego of Schapiro and his son and (2) the corporate form has been used to achieve a fraudulent and "unequitable" result. Schlobohm urges the trial court to disregard the corporate fiction and to hold Schapiro and his son personally liable for the actions and debts of the corporate entity. Due to the fact that these allegations were made and evidence concerning alter ego was presented at the special appearance hearing, the alter ego question is at issue in determining whether in personam jurisdiction should be imposed upon Schapiro. *See, e.g., 3–D. Electric Co.,* 706 S.W.2d at 138 n. 2. The finding that the company is Schapiro's alter ego may justify a finding that the individual "engages in business" in the jurisdiction through local activities of the corporation. *Cf. 3–D Electric,* 706 S.W.2d at 139 (holding that a close relationship between a parent corporation and a subsidiary may justify finding that the parent "engages in business" in the jurisdiction through the local activities of its subsidiary). Therefore, we hold that the trial court properly addressed the alter ego issue in its analysis to determine if in personam jurisdiction is justified. We overrule Schlobohm's fourth point of error and affirm the trial court's judgment.

HECHT, J., dissents with opinion.

HECHT, Justice, dissenting.

I doubt whether there is any legal doctrine more ritualistic than personal jurisdiction. This doctrine invariably invokes in-

cantation—from "traditional notions of fair play and substantial justice" to "purposeful availment". I suspect the explanation is that courts too often yield to the temptation to surrender the difficult struggle to understand the doctrine coherently, and to revert instead to more easily recited but less meaningful liturgy.

The majority have done our necessary obeisance to the personal jurisdiction liturgy of the sundry cases. I agree that the standards for determining the limits of personal jurisdiction are those they expound. Only in applying these standards to this case do the majority and I part company. Beyond the rhetoric of caselaw, the crux of the matter is simply, did Schapiro conduct himself in such a way that he should reasonably have expected to answer for that conduct in the courts of Texas. Because I believe it is rather clear from the evidence that he did, I respectfully dissent.

· Schapiro's dealings with Texas are described in the testimony of two witnesses, Schapiro himself and Richard Craft.[1] Their testimony, summarized below in somewhat more detail than in the majority opinion, reveals, I believe, that Schapiro should well have known that his actions placed him within reach of Texas courts.

### Schapiro's Testimony

Schapiro is a physician with a specialty in diagnostic radiology practicing in Pittsburgh, Pennsylvania, and living in one of its suburbs. In July 1984 Schapiro's older son, Douglas, called to say that he and his wife had formed a corporation called Hangers, Inc. for the purpose of opening dry cleaning outlet stores in major office buildings. Schapiro thought the idea was a bright one and, at Douglas' invitation, invested $10,000 in Hangers, receiving stock in the corporation in return. Although Schapiro was not involved in incorporating Hangers, its corporate records were kept by his attorney in Pittsburgh.

Hangers leased space for its outlets, and Schapiro guaranteed some of those leases.

After the outlets operated successfully for a few months, Douglas wanted to open a dry cleaning plant to clean the clothes taken in through the outlets. Schapiro agreed to assist Hangers in acquiring equipment worth $180,000, and loaned Hangers $30,-000 of his personal funds for the down payment. In late 1984 or early 1985 Schapiro came to Dallas to look over the business and to obtain financing from MBank for the rest of the plant. After negotiating an interest rate a half point lower than MBank had initially offered, Schapiro signed a promissory note for $136,702.10 to purchase equipment for the plant. Schapiro owned the equipment and leased it to Hangers. (Schapiro also owned at least one car used by Hangers' employees.)

Hangers leased the premises for the plant from the Schlobohms. Although Schapiro had guaranteed other leases for Hangers, he was not asked to, and did not, guarantee this one. He did not negotiate the lease with the Schlobohms and to his knowledge never talked with them.

The business needed more money, in Schapiro's words, "[v]irtually weekly, biweekly or at least monthly", and Schapiro loaned it on request. Late in 1984 Schapiro insisted that all the stock in the corporation be transferred to him, and Douglas and Richard Craft, both shareholders from the inception of the corporation, begrudgingly complied.

In early 1985, Douglas was president of Hangers. Schapiro was the sole shareholder and sole director but held no other office and was not involved in the day to day operations. Douglas did not need his father's approval to open new outlet stores.

By the summer of 1985 Schapiro's investment was fairly extensive, and he "had some sense of alarm." Part of his concern was a lack of information about the business. For many months, Schapiro testified, "[t]here were endless communications from Pittsburgh to Dallas, all of which [were] basically one way." To allay his fears,

---

**1.** Although two other witnesses—Schapiro's son Douglas and Terry Allen of MBank—also testified before the trial court, I do not consider their testimony significant in determining the jurisdictional issue.

Schapiro sent his personal accountant to Dallas to ensure at least that appropriate accounting and reporting mechanisms were in place.

In October 1985, returning home from a workshop in San Antonio, Schapiro stopped in Dallas and visited Douglas about the condition of the business. About three months later, in January 1986 Schapiro visited Dallas again to check the condition of the business. That same month he resigned as a director because he could not get the information he wanted out of Hangers' management.

In February 1986 Schapiro received information which he realized, in a "flash of anxiety at 2:00 o'clock in the morning", meant the business had about a $50,000 operating deficit. After conversing with Douglas, who agreed there was an operating deficit but thought it was more like $15,000–25,000, Schapiro was "[e]xplosively" alarmed. Schapiro again sent his personal accountant to Dallas to evaluate the condition of the business. Shortly thereafter Schapiro refused to have anything further to do with the business.

### Richard Craft's Testimony

Craft was Hangers' vice president and plant manager from August 1984 to July 1986. He initially owned stock in the corporation but later sold his shares to Schapiro when Schapiro demanded that he do so.

Craft testified: "From my position I could see a lot of activity between [Schapiro] and his various business associates in Hangers aside from the constant stream of money that was coming from Pittsburg [sic]." Craft constantly compiled information to send to Pittsburgh in response to many phone calls he received from Schapiro's secretary and agents in Pittsburgh. According to Craft, "any major transaction," like a lease or transfer of money, "was approved by [Schapiro] or one of his business associates." Craft also testified:

Q Do you have an opinion as to [Schapiro's] control over the corporate affairs?

A Yes, sir.

Q What is that opinion?

A [Schapiro's] control was—[Schapiro] was the corporation and made the major decisions of that.

Q On what do you base that opinion?

A The amount of activity, day to day, constant transfers of money.

We felt ultimately we were making decisions by committee between Dallas and Pittsburgh, and no serious action could ever be taken without being approved in Pittsburg [sic] first.

On cross-examination, Craft admitted that he had written Schapiro and threatened that if Schapiro did not pay him $50,-000, he would institute civil suits and an IRS investigation against Schapiro, and a criminal prosecution against Douglas. Schapiro never paid Craft more than $2,700. Craft did complain to the IRS about Schapiro but never sued him. Craft testified that he has nothing against Schapiro personally, but that his feelings have been hurt because of the time he invested in the business and the way he was treated in the end.

### Schapiro's Reasonable Expectation

On this record I cannot imagine how Schapiro could have invested hundreds of thousands of dollars in a Dallas business run by his son, served as the sole director and shareholder of the corporation for most of the period in question, advanced the business money on a weekly or monthly basis for some two years, had "endless communications" with the business, made two trips to Dallas to see the business, sent his accountant to inspect it two other times, negotiated a $136,000 loan from a Dallas bank to buy equipment to lease to the business, guaranteed some of the business' leases, and kept the corporate records with his personal attorney, and never reasonably have expected that he might be subject to suit in Texas. Even if Craft's credibility was undermined, Schapiro's own testimony established that he called the shots in Dallas. Comparing the facts of this case with those cited by the majority and the parties, I see nothing unfair or offensive in requiring Schapiro to answer in a Dallas court the actions he freely took here.

The limits of courts' in personam jurisdiction are not defined with certainty. I fear that our decision in this case contributes to the uncertainty and confusion in this area of the law. It is for this reason that I respectfully decline to join in the result reached by the majority.